UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

J&B Wholesale Distributing, Inc.,
a Minnesota corporation,

    Plaintiff,
v.

Redux Beverages, LLC,
Redux Inc., Redux, LLC, and
James Kirby.

    Defendants.

MEMORANDUM OPINION
AND ORDER
Civil No. 07-4570 (MJD/SRN)

---

    Thomas J. Shroyer and Marcy R. Frost, Moss & Barnett, A Professional Association, for and on behalf of Plaintiff.

    Clegg Ivey, Redux Beverages LLC and John B. Lunseth, Briggs & Morgan, P.A., for and on behalf of Defendants.

---

    By Order dated December 7, 2007, this Court issued a temporary restraining order of behalf Plaintiff J&B Wholesale Distributing, Inc. ("J&B") . This matter is now before the Court upon J&B's motion for a preliminary injunction and its unopposed motion to amend the Complaint. For the reasons provided herein, the motions will be granted.

Factual Background

    J&B was founded in 1979 and is a wholly owned subsidiary of J&B Group, Inc.  The affiliated J&B Group offers goods and services that include the production and sale of frozen and refrigerated food products.  J&B is

1

headquartered in St. Michael, Minnesota and employs 425 people. J&B also employs an additional 200 people at other locations in Minnesota and other states.

J&B sells meat, fish and poultry products under the No Name® and No Name Steaks® marks. The No Name Steaks® mark was first adopted and used by Frez-R-Pak in 1971 in connection with the sale of specialty cut steaks. Use of the mark in interstate commerce began in 1975, and has been used continuously since that date. Frez-R-Pak has used the No Name® mark in commerce since 1997.

In 1993, J&B acquired the exclusive right to produce and distribute meat products under the No Name® mark. In 1998, J&B acquired all right, title and interest in the marks No Name® and No Name Steaks®, including the goodwill associated with the marks. J&B is thus the owner of, or applicant for, the following registrations for the No Name® and No Name Steaks® trademarks: No Name Steaks®, U.S. Reg. 1,601,126; No Name®, U.S. Reg. No. 2,164,808; No Name® covering fish, poultry, beef, pork, hot dogs, sausages and bacon, U.S. Reg. No. 2,869,731; and No Name Fully Guaranteed est. 1970 Butcher Quality Meats®, App. Ser. No. 78-529982; No Name Fully Guaranteed Butcher Quality Meats & Design®, App. Ser. No. 77-289,408; No Name Steaks®, Minn. Reg. No. 15732; and No Name Steaks®, Minn. Reg. 15733.

Currently, J&B offers 22 different fresh and frozen products under the No Name® mark. J&B has increased sales under the No Name® marks from

$500,000 in 1993 to $26.6 million in 2006. Henderson Aff., ¶ 7. J&B has also entered into a new distribution agreement with Target Superstores, resulting in the product being available in 86 additional stores in J&B's established distribution area and 137 stores, in an additional 12 states, resulting in an expansion of J&B's territory for retail stores to 25 states. Id. In addition, J&B sells No Name® products online via its website at "nonamesteaks.com". Id. ¶ 8.

Defendants Redux Beverages, LLC, Redux Inc., Redux, LLC, and James Kirby (collectively "Redux") began marketing an energy drink called "Cocaine" in 2006. According to Redux's website, the FDA issued a warning letter to Redux regarding its use of the name Cocaine for its energy drink. Hiatt Aff., Ex. A. In May 2007, the Attorney General in Texas seized product from a Redux distributor's Dallas location and started an action against Redux. Id. Use of the "No Name" mark by Redux in connection with its energy drink emerged after Redux was pressured to change the name of its drink. Id.

On October 13, 2007, a J&B employee overheard his son talk of an energy drink called "Cocaine". Chapa Aff., ¶ 2. He got on the internet to confirm such a drink existed, and discovered that not only was there a drink called "Cocaine" but that it was being marketed as "No Name." Id. ¶ 4. He reported this to his manager, who was aware of Redux's application to register "No Name" with respect to the energy drink, but was unaware of the connection between the "No Name" drink and the drink referred to as "Cocaine." Henderson Aff., ¶ 16.

After discovering the connection between the "Cocaine" energy drink with

3

the "No Name" mark, J&B learned that Redux's energy drink is available for purchase in Minnesota in places such as convenience stores, and a local record shop. See Hiatt Aff. ¶¶ 13 and 15. J&B also learned that Redux also operates websites from which consumers may order the energy drinks online. The domain names from which the drink may be purchased include the following: "drinknoname.com", "drinkcocaineshop.com" and "drinknonameshop.com". Id. ¶¶ 2, 6 and 7.

On November 9, 2007, J&B's counsel personally served Redux with a cease and desist letter. Shroyer Aff., ¶ 2. The letter explained J&B's concerns, and that a motion would be filed by November 14, 2007 if steps were not taken. The motion for injunctive relief was filed after J&B received no word back from Redux.

J&B has filed suit against Redux, asserting the following causes of action: 1) federal trademark infringement under 15 U.S.C. § 1114; 2) federal unfair competition under 15 U.S.C. § 1125(a); 3) cybersquatting under 15 U.S.C. § 1125(d); 4) Minnesota trademark infringement under Minn. Stat. § 333.28; 5) infringement of common law rights in violation of Minn. Stat. §§ 33.28 and 333.30; and 6) dilution in violation of Minn. Stat. § 333.285.

Standard

The Eighth Circuit has established the following analysis to be used in considering a request for preliminary injunctive relief:

> [W]hether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting

the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest.

Dataphase Sys., Inc. v. C. L. Sys., Inc., 640 F.2d 109, 113 (8th Cir. 1981); accord Medtronic, Inc. v. Gibbons, 527 F. Supp. 1085, 1090 (D. Minn. 1981), aff'd, 684 F.2d 565 (8th Cir. 1982).

I. Likelihood of Success on the Merits.

A. Infringement Claims

Under the Lanham Act,

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which–

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

In order to show trademark infringement under the Lanham Act, J&B must show that it has a mark entitled to protection and that Redux's use of the mark

is likely to confuse consumers as to the source of Redux's product or services. 15 U.S.C. § 1125(a); Everest Capital Ltd. v. Everest Funds Mgmt., L.L.C., 393 F.3d 755, 759 (8th Cir. 2005).

   1. Ownership/Validity of the Trademarks

J&B has submitted documentation that it has obtained federal and state registrations for the marks No Name® and No Name Steaks®. Under the Lanham Act, registration constitutes *prima facie* evidence of ownership and validity. 15 U.S.C. § 1057(b). Redux does not appear to challenge this element of the infringement claim. Accordingly, J&B has met its burden of demonstrating that the marks are entitled to protection.

   2. Likelihood of Confusion

"The principle focus in analysis of the likelihood of confusion is whether the consuming public is likely to be confused as to the origin or sponsorship of goods. Scott v. Mego Int'l, Inc., 519 F. Supp. 1118, 1128 (D. Minn. 1981) (citation omitted). With this focus in mind, the Court examines the following factors in determining the likelihood of confusion:

> 1) the strength of the plaintiff's mark; 2) the similarity between the plaintiff's and defendant's marks; 3) the degree to which the allegedly infringing product competes with the plaintiff's goods; 4) the alleged infringer's intent to confuse the public; 5) the degree of care reasonably expected of potential customers, and 6) evidence of actual confusion.

Davis v. Walt Disney Co., 430 F.3d 901, 903 (8th Cir. 2005) (citations omitted).

   a. Strength of the Mark

"Generally, the strength of the mark depends on two factors - the distinctiveness of the mark and the extent to which the mark is recognized by the relevant consumer class."  Aveda Corp. v. Evita Mktg, Inc., 706 F. Supp. 1419, 1428 (D. Minn. 1989).  The distinctiveness of a mark is determined by whether the mark is generic, descriptive, suggestive or arbitrary/fanciful.  Frosty Treats, Inc. v. Sony Computer Entm't Am., Inc., 426 F.3d 1001, 1004 (8th Cir. 2005).  An arbitrary mark is one that bears no relation to the product.  Deltona Transformer Corp. v. Wal-Mart Stores, Inc., 115 F. Supp. 2d 1361, 1366 (M.D. Fla. 2000).  Such marks are entitled to protection whether or not they have acquired secondary meaning.  Frosty Treats, 426 F.3d at 1005.

J&B asserts that its marks are arbitrary, as they bear no relation to the product.  J&B further asserts that the marks have also acquired a significant degree of recognition in the marketplace, resulting in a mark that is strong and entitled to protection.

Redux argues that "No Name" suggests three subtle connotations: that the products are sold without a brand name; they are inexpensive and affordable and they come from humble beginnings. Thus, Redux argues, the mark is suggestive and should not be afforded much protection.

The Court disagrees.  J&B has demonstrated that it uses "No Name"  to sell high quality meat and other food products, and that its brand name is "No Name." Furthermore, standing alone, "No Name" does not bear any relation to the product - that is it does not tell the consumer anything about the product.  The Court thus

finds that "No Name" is an arbitrary mark that is entitled to protection.

Redux further argues that the mark is commercially weak because many third party users use the mark. In support, Redux refers to a search of the USPTO that revealed more than 81 records for "No Name" marks, 23 of which are federally registered trademarks and 16 are applicants for registration. Applegate Decl., ¶¶ 58, 62 and 63. In the last 50 years, 42 trademarks that include the words "No Name" have either been granted or applied for. Redux asserts that even though some of these uses have been abandoned, or involve remote uses, or limited geography, the fact that such uses exist must be taken into account in determining the protection to be accorded J&B's mark. Amstar Corp. v. Domino's Pizza, 615 F.2d 252, 259-260 (5th Cir. 1980).

J&B responds that the third party uses cited by Redux involve unrelated products, therefore such use should not be given much weight. ConAgra, Inc. V. George A. Hormel & Co., 784 F. Supp. 700, 709 (D. Neb. 1992). For example, J&B notes that one third party use, No Name Nutrition Market, is a health food store in Omaha and the products displayed are not branded "No Name". Stolt Aff, Ex. V, § U. Another third party use cited by Redux is Loblaw, a Canadian grocery store which maintains a house brand called "No Name" for generic products. Loblaw is not located in the United States and does not sell product on line. Supp. Henderson Aff., ¶ 9. It is thus unlikely that consumers of J&B's products would be exposed to Loblaw's "No Name" products.

The law is clear that the extent of third party use of a mark must be taken

into consideration in determining the likelihood of confusion. <u>Amstar</u>, 615 F.2d at 259-60 ("The greater the number of identical or more or less similar trademarks already in use on different kinds of goods, the less is the likelihood of confusion.") <u>See also</u> <u>Scarves by Vera, Inc. v. Todo Imports Ltd.</u>, 544 F.2d 1167, 1173 (2nd Cir. 1976) ("The significance of third-party trademarks depends wholly upon their usage."). The Court has reviewed the evidence submitted by Redux as to third party uses and finds such uses should not be given much weight.

For the most part, the third party uses identified by Redux are unrelated to a specific food or drink product. In addition, Redux has not put forth any evidence that the third party uses were well promoted or recognized by consumers who would purchase either J&B's or Redux's products. Finally, the third party uses identified by Redux involve a combination of words rather than "No Name" alone, such as "No Name Lounge", "No Name Interactive", "Pub with No Name", "No Name Recordings." <u>Id.</u> at 1174. These combinations would, more than likely, hinder confusion rather than promote it.

The Court thus finds that J&B has, at this stage of the proceedings, established that its mark is strong and that this factor contributes to a likelihood of confusion.

b. Similarity of the Marks

J&B further asserts that the mark adopted by Redux is identical to J&B's mark. In opposition to J&B's motion, Redux offered no evidence rebutting this assertion. Accordingly, this factor contributes to a finding of likelihood of

9

confusion as well. See Davis, 430 F.3d at 903-04 (identical marks weigh in favor of claimant).

    c. Degree of Competition

Redux argues this factor weighs in its favor because its product does not directly compete with J&B's product. Redux asserts there can only be a likelihood of confusion if the products are sufficiently closely related that consumers are likely to think that the products come from the same source. Products are sufficiently close if they complement one another, such as pancake mix and pancake syrup. Aunt Jemima Mills Co. v. Rigney & Co. 247 F. 407 (2nd Cir. 1917). On the other hand, if the products are not closely related, there is no competitive proximity and confusion is less likely. Davis v. Walt Disney Co., 430 F.3d at 904. In this case, Redux asserts that products are not closely related, they are not sold in the same stores and they do not complement each other. In addition, the products are targeted to different consumers.

A showing of direct competition is not required for a finding of likelihood of confusion. Kemp v. Bumble Bee Seafoods, Inc., 398 F.3d 1049, 1056 (8th Cir. 2005). "Where products are wholly unrelated, this factor weighs against a finding that confusion is likely. Where products are related, however, it is reasonable for consumers to think that the products come from the same source, and confusion therefore, is more likely." Id. (citation omitted).

Courts have found that food and drink products may be closely related for purposes of determining likelihood of confusion. See eg. Frank Brunckhorst Co.

v. G. Heileman Brewing Co., Inc., 875 F. Supp. 966, 979 (E.D.N.Y 1994). In assessing this factor, the court should consider "the extent to which the products differ in content, geographic distribution, market position and audience appeal." Id. In this case, the record shows that the geographic distribution of the parties' products overlap. While J&B sells a food product, and Redux an energy drink, "it constitutes no great stretch of the imagination for consumers" to reasonably believe that J&B decided to launch an energy drink in addition to its meat products, as companies frequently cross product lines. Id.

As for methods of distribution, both J&B and Redux offer their products online. While Redux has not sold its product in grocery stores to date, other energy drinks are sold in grocery stores, and it is likely that consumers who shop in grocery stores will also shop in convenience stores. See eg. Deltona Transformer Corp, 115 F. Supp. 2d at 1369 (finding those who shop at plaintiff speciality retail shops also shop at Wal-Mart). Based on the similarity of the channels through which the product is sold, and the fact that a consumer could reasonably believe J&B had launched into the energy drink market, the Court finds this factor weighs if favor of finding a likelihood of confusion.

    d.  Intent to Confuse

Intent to confuse is not an element of trademark infringement, but evidence of an intent "on the part of the alleged infringer to pass off its goods as the product of another raises an inference of likelihood of confusion." SquirtCo v. Seven-Up Co., 628 F.2d 1086, 1091 (8th Cir. 1980). J&B asserts that Redux had

constructive notice of J&B's marks, as J&B has obtained federal registration of the marks. 15 U.S.C. § 1072. J&B thus asserts it is entitled to the benefit of such notice. In addition, J&B asserts that Redux has acted in bad faith with respect to this litigation, and that such bad faith should weigh in favor of an intent to confuse.

Redux responds that there is no evidence that it intended to cause confusion by adopting the "No Name" mark. Redux did a trademark search prior to adopting the mark, and the numerous records that revealed the use of "No Name" weighs against a finding of intent to confuse.

The Court finds that based on the record currently before it, this factor does not weigh in favor of either party.

e.  Degree of Consumer Care

Consumers tend to exercise less care when purchasing lower costs items, making confusion more likely. E & J Gallo Winery v. Gallo Cattle Co., 967 F.2d 1280, 1293 (9th Cir. 1992). With respect to food products, courts have found that consumers generally leave their sophistication at home. Brunckhorst, 875 F. Supp. at 983 (citation omitted). As the products at issue in this case are food and drink products, that are purchased at a relatively low price, this factor weighs in favor of a finding of likelihood of confusion.

f.  Actual Confusion

As Redux only recently started using the No Name® mark, lack of actual confusion is not to be given significant weight. See MSP Corp. v. Westech

Instruments, Inc., 500 F. Supp.2d 1198, 1211 (D. Minn. 2007) (citing Advantus Capital Mgmt, Inc. v. Aetna, Inc., No. 06-CV-2855 (JMR/FLN), 2006 WL 2916840, at *5 (D. Minn. Oct. 11, 2006) ("The test for infringement lies in the likelihood of confusion, not actual confusion; therefore, plaintiffs are not required to prove any instances of actual confusion. The absence of demonstrated confusion, especially when plaintiff has prudently attempted to forestall it, does not weigh for or against either party on the issue of confusion.").

As the factors discussed above weigh in favor of a finding of likelihood of confusion, the Court concludes that J&B has demonstrated a likelihood of success on the merits of its trademark infringement claim.

B.  Dilution Claim

Under Minnesota law,

(a) The owner of a mark that is famous in this state may, subject to the principles of equity and upon terms the court considers reasonable: seek an injunction against another person's commercial use of a mark or trade name, if the use begins after the mark has become famous and causes dilution of the distinctive quality of the mark; and obtain other relief as provided in this section.

In determining whether a mark is distinctive and famous, a court may consider factors such as, but not limited to:

> (1) the degree of inherent or acquired distinctiveness of the mark in this state;
>
> (2) the duration and extent of use of the mark in connection with the goods and services with which the mark is used;
>
> (3) the duration and extent of advertising and publicity of the mark in this state;

>    (4) the geographical extent of the trading area in which the mark is used;
>
>    (5) the channels of trade for the goods or services with which the mark is used;
>
>    (6) the degree of recognition of the mark in the trading areas and channels of trade in this state used by the mark's owner and the person against whom the injunction is sought;
>
>    (7) the nature and extent of use of the same or similar mark by third parties; and
>
>    (8) whether the mark is the subject of a state registration in this state, or a federal registration under the Act of March 3, 1881, or under the Act of February 20, 1905, or on the principal register.
>
> (b) In an action brought under this section, the owner of a famous mark is entitled only to injunctive relief in this state, unless the person against whom the injunctive relief is sought willfully intended to trade on the owner's reputation or to cause dilution of the famous mark. If willful intent is proven, the owner is entitled to the remedies in this chapter, subject to the discretion of the court and the principles of equity.

Minn. Stat. § 333.285.

To prove its dilution claim, J&B must show: (1) its mark is famous; (2) its mark is distinctive; (3) Redux's use must be a commercial use in commerce; (4) the use must have occurred after J&B's mark became famous; and (5) the use must cause dilution of the distinctive quality of J&B's mark. Northland Ins. Companies v. Blaylock, 115 F. Supp. 2d 1108, 1122 (D. Minn. 2000) (construing Minnesota dilution claim consistent with federal dilution claim).

Applying the factors listed above, the Court finds that J&B has demonstrated that its mark is famous and distinctive. The No Name Steaks® mark has been used in Minnesota since 1971, and the No Name®mark has been

used since 1996.  J&B has spent $50 million advertising its products sold under these marks, they are distributed in 25 states, and sold in major retail grocery stores.  Henderson Aff., ¶ 11.  In addition, J&B asserts the extensive placement of its products are complemented by J&B's website, which allows consumers to purchase product online. Id. ¶ 8.

Furthermore, the evidence shows that Redux began using the mark in commerce well after the No Name® mark became famous - on its website and on the product itself.

"Dilution is grounded on the idea that a trademark can lose its 'ability . . . to clearly and unmistakably distinguish one source' through unauthorized use." Hormel Foods Corp. v. Jim Henson Productions, Inc., 73 F.3d 497, 506 (2nd Cir. 1996) (citing 3 McCarthy on Trademarks and Unfair Competition § 24.13[1][a] at 24-106 (3d ed. 1995)).  A trademark can be diluted through tarnishment.  Id. at 507.  Tarnishment occurs when a product is "'linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context' with the result that 'the public will associate the lack of quality or lack of prestige in the defendant's goods with the plaintiff's unrelated goods.'"  Id. (citation omitted).

J&B asserts it has demonstrated that Redux's use of the No Name® mark, in connection with an energy drink formerly called "Cocaine", tarnishes the mark. In response, Redux asserts that "No Name" is widely used by third parties, often for products and services that are culturally subversive and involve deviant behaviors of sex and drug use.  For example, "no name cigarette" is another name

for marijuana, and that "no name" is slang for heroin.  Also, "The Group with No Name" is an Internet community of adults interested in engaging in sexually deviant behaviors such as bondage and S&M.  Given these and other salacious uses of the "No Name" mark, Redux argues it is impossible that its use of the mark caused any actual dilution.

The Court finds that J&B has also demonstrated that Redux's use of the No Name® mark, in connection with an energy drink formerly called "Cocaine", tarnishes the mark. As the dilution claim has been asserted under Minnesota law, only third party uses in Minnesota are relevant here.  Redux has not established that the salacious uses described above are used or known in Minnesota.  Furthermore, the uses Redux describes are not likely to be easily located together with J&B's products at stores such as Cub, Target or online.

Irregardless, where there is an identity of marks, actual dilution may be presumed. Savin Corp. v. Savin Group, 391 F.3d 439, 454 (2nd Cir. 2004).  At this stage, Redux has not rebutted this presumption.

Accordingly, the Court finds that J&B has demonstrated a likelihood of success on the merits of its dilution claim as well.


2.  Irreparable Harm

Irreparable harm is presumed where there is trademark infringement.  See West Publ'g Co. v. Mead Data Cent., Inc., 799 F.2d 1219, 1229 (8th Cir. 1986). This factor thus weighs in favor of the requested injunctive relief.

3. Public Policy

The public interest weighs in favor of protecting consumers against trademark infringement. See <u>Am. Dairy Queen Corp. v. New Line Prods., Inc.</u>, 35 F. Supp. 2d 727, 733 (D. Minn. 1998). Accordingly, this factor also weighs in favor of the requested injunctive relief.

4. Balance of Harms

The balance of harms also weighs in favor of injunctive relief, as Redux just recently began using the No Name® mark. <u>MSP</u>, 500 F. Supp.2d. at 1217-1218.

Redux nonetheless argues that if the injunction is granted, it will have to change the name of its drink for the third time in six months, and that this will cause a catastrophic loss of consumer good will and loss in confidence with its distributors. J&B has presented evidence, however, that a customer of Redux claims that Kirby informed him Redux has reached an agreement with the FDA, and will resume selling its energy drink under the "Cocaine" name. Klein Aff., ¶¶ 5-7. The customer's claims is consistent with an email from James Kirby, posted on its website, which states he was changing the name back to "Cocaine." Klien Aff., Ex. D. The balance of harms thus weighs in favor of the requested relief.

IT IS HEREBY ORDERED:

1. J&B's Motion to Amend the Complaint [Doc. No.54 ] is GRANTED. J&B may file and serve its Second Amended Complaint in the form submitted as Exhibit A to such motion within ten (10) days from the date of this Order.

2. J&B's motion for a preliminary injunction order [Doc. No. 4] is hereby

17

granted, as the record herein, including the affidavits and pleadings, memoranda of law, and the argument of counsel, demonstrate that there is a threat of irreparable harm to J&B if relief is not granted, the harm of not granting the injunction will outweigh any injury occasioned by issuing the injunction, J&B is likely to succeed on the merits and the public interest supports the injunction.

3. Defendants, their officers, agents, servants, partners, employees, attorneys and all others in active concert or participation with defendants, during the pendency of this action, are hereby enjoined and restrained from:

a) Any and all continuing or further use of the J&B Marks specified in the complaint, or elements thereof, including any use in connection with any products, in any advertising, on the Internet and in any domain names used on the Internet including but not limited to: www.drinkcocaine.com, www.drinkcocaineshop.com, www.drinknoname.com, and www.drinknonameshop.com;

b) Manufacturing and selling any products bearing the J&B Marks or elements thereof.

4. Defendants are further ordered to immediately supply J&B with a list of the names and addresses of all agents, distributors, jobbers, warehouses, shippers and sales outlets in possession of any products that have been shipped bearing the "Redux No Name Mark," along with copies of verified mailings to each of the above evidencing defendants' demand to return to Defendants any such inventory in their possession.

5.      It is further ordered that the party acting as Registrar of the following domain names shall immediately suspend them from further use: www.drinkcocaine.com, www.drinkcocaineshop.com, www.drinknoname.com, and www.drinknonameshop.com.

6.      This injunction shall be effective upon the filing by J&B of security with the Clerk of Court in the sum of $50,000.

            BY THE COURT:

Dated:  December 20, 2007.   s / Michael J. Davis
                 Michael J. Davis
                 Judge of District Court